(No. 4572—

LEOTA ANDERSON, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed March 25, 1955.*
*Opinion on Rehearing filed January 8, 1957.*

ROBSON, MASTERS, AND RYAN, Attorneys for Claimant.
LATHAM CASTLE, Attorney General; THOMAS G. CRONIN, Assistant Attorney General, for Respondent.

WHAM, J.

Claimant, Leota Anderson, in her complaint alleges that the State of Illinois negligently maintained the floor of the McDonough Street bridge, which crosses the Deep Waterway in the City of Joliet, Illinois. It further alleges that, while driving across said bridge on April 30, 1953, her automobile was thrown out of control, due to a defect in the bridge floor, and into and against the steel upright of the bridge. She sustained personal injuries, for which she claims the sum of $6,500.00, and damages to her automobile, for which she claims the sum of $612.00.

Her complaint alleges the following acts of negligence on the part of respondent:

"(a) Negligently and carelessly permitted large holes to remain and exist in the floor of said bridge;

(b) Negligently and carelessly permitted deep ruts and other irregularities to be and remain in the floor of said bridge;

(c) Negligently and carelessly maintained or failed to maintain the floor of said bridge."

She further alleges that this condition had existed for a considerable period of time prior to the accident, and that respondent knew, or should have known of the existence of the defect, which she claims caused the accident.

Respondent filed no answer to the complaint, and, under Court of Claims Rule No. 11, a general denial of the facts set forth in the complaint is considered to have been filed.

It is well established that the State of Illinois does not act as an insurer in the maintenance of its highways and bridges. Respondent can be held responsible in this case only if it is established by the greater weight of the evidence that claimant, while in the exercise of due care and caution, was injured and damaged as the proximate result of a defect, which was dangerous and unsafe for ordinary travel, and of which the state had actual or constructive notice, and was negligent in allowing such defect to remain uncorrected.

The burden of proof is, of course, upon claimant.

In determining the question of liability, we will briefly set forth claimant's testimony, inasumch as she was the only witness to testify at the hearing with respect to the happening of the accident and the condition of the bridge.

Claimant testified that she was employed by the Caterpillar Tractor Company as secretary to the manager; that on the 30th of April, 1953, at approximately 5:00 P. M., she was driving her Ford sedan automobile at approximately 10 miles per hour across the McDonough Street bridge going home from work. At the time she crossed the bridge it was raining quite hard and the traffic was very heavy going east, the direction in which she was traveling. She was approximately 10 feet behind the automobile proceeding immediately in front of her. She testified that, as she approached and came to the center of the bridge in second gear, the left front wheel of her automobile caught in a deep rut in the road, which caused the steering wheel to spin out of her hand, and the automobile to swerve across the 16 foot roadway out of control, over a curb 10 inches in heighth,

and into a steel upright on the north side of the bridge. She hit the windshield, and lost consciousness.

She further testified that, when she lost control, she applied her brakes, and the automobile slid into the upright after going over the curb.

Two sets of streetcar tracks run along the bridge, one eastbound and the other westbound. Claimant testified that her left wheels were to the right of the north or inside rail of the eastbound tracks at the time she lost control of her automobile.

Claimant's exhibits Nos. 2 and 3, which are photographs of the automobile, indicate a substantial amount of damage at the point of impact, which appears to be squarely in the middle of the front bumper. The damage, as shown by the photographs, appears to us to be more substantial than what could ordinarily be expected in a collision with the upright at the speed and in the manner described by claimant.

Later claimant, on being recalled by her attorney to testify, identified the rut, which she referred to as claimant's exhibit No. 7, and circled it in ink.

From an examination of exhibit No. 7, which is a photograph taken on May 1, 1953, and identified by claimant as correctly portraying the condition of the bridge floor on that date, we note the place encircled. There appears to be a small hole or break in the wooden bridge floor near the north rail of the streetcar track. The photograph, however, is of no help in determining the size and character of the hole or break. It is impossible for us to tell from viewing the photograph whether it was a defect of recent or long standing origin, or whether it was of sufficient size to catch the wheel of claimant's automobile, and cause it to go out of control. Nowhere in the record is

there any further testimony concerning the character of this hole or break.

It appears from the record that the surface of the bridge had, for some while, been deteriorating. It was constructed of wood, and had, in some places, been patched by iron plates. Respondent's exhibit No. 2, the Departmental Report, established that respondent had, on April 12, 1952, awarded a contract for the removal of the wooden floor, and replacement of it with a steel grid floor, but, due to the shortage of steel, the contractor had been unable to secure materials, and commence work until May 27, 1953.

Claimant offered another exhibit, No. 5, to show the character of the bridge floor, and also to prove notice to respondent of the condition of the bridge floor. This exhibit was of a photograph published in the Joliet Herald News on Sunday, April 12, 1953, showing the bridge surface, and calling attention to the fact of the deterioration of the flooring, which had made the bridge so bumpy that cars bounced about when crossing it.

From the above, it does not appear to us that claimant has borne the burden of proving either the existence of a defect, which caused the accident, or notice to the state of the defect. Even assuming for the moment the existence of the "rut", and that it was of sufficient size to have caused claimant to lose control of her automobile, and thus be a danger to the traveling public, yet nowhere is there any evidence from which we can find that the state had notice of the existence of such a rut. The only evidence, as we have stated before, is that the bridge was generally deteriorating. There is no evidence as to the length of time this rut was known by anyone to exist. Nowhere in the evidence is there any contention that

any other portion of the bridge floor presented a dangerous hazard to the traveling public.

It is to be noted from claimant's exhibit No. 5, which she contends establishes notice to the state, that nowhere in the photograph or accompanying comment is there any indication of a rut or hole, which would cause a driver to lose control of an automobile. The hole referred to in that picture is one in which the comment states was patched with an iron plate. The newspaper only complained that the bridge was bumpy. This photograph does not constitute proof of notice to the state of a dangerous defect.

Nor can we say that the general deteriorating condition of the bridge floor was sufficient in itself to establish such notice, either actual or constructive. Claimant does not base her claim on the general condition of the bridge floor, but, rather, a specific hole or rut, which caused her to lose control of her automobile. It is this particular condition of which the state must have had knowledge before notice can be said to have been proved.

Constructive notice, likewise, has not been proved. Such notice in this case can only be established by a showing that the defect complained of existed for a sufficient length of time from which a presumption of knowledge arose. No evidence was presented as to when this rut originated, or the cause thereof; and, therefore, no time has been established from which knowledge can be presumed.

There is no contention that respondent failed to conduct reasonable inspections of the bridge, and even so there could be no contention that the defect should have been discovered prior to the accident, inasmuch as there is no proof when the defect came into existence,

or no proof that the state should have anticipated the defect, such as from a history of prior accidents occurring on the floor of the bridge due to defects of such character.

It cannot be contended from the mere fact that the state had let a contract to replace the surface of the bridge that it had notice of a dangerous hazard. Bridge floors, like anything else, wear out, and must be replaced in the natural course of events. The fact that such was contemplated does not, in the absence of other evidence, indicate a knowledge upon the part of the state that the bridge was dangerous and hazardous to the traveling public.

In addition to the question of notice, claimant has not established to our satisfaction the existence of a defect large enough to have caused her automobile to take the action it did. She submitted no evidence of measurements. She called no witness, who was familiar with the surface of the bridge.

Without further evidence establishing the existence of a defect, we cannot give much weight to claimant's testimony in regard to the alleged defect, since her testimony is very meager in this regard. She was traveling closely behind the automobile immediately preceding her, bumper to bumper as she described it at one place in her testimony, and in all probability claimant did not see the actual floor of the bridge ahead of her. We note she did not testify that she saw the rut. We also note that, when she was asked by her attorney to point out the rut, she did so without giving any explanation as to how she knew that was the place. She did not testify that she had ever seen that particular rut before, although she crossed the bridge every day. It appears to us to be somewhat un-

usual that under these circumstances she could be so positive concerning this particular location.

We further note that the location of the alleged rut or hole, which claimant indicated on the photograph, was immediately adjacent to the north or inside streetcar track rail. Her testimony does not convince us that it was not the wet rail, rather than a hole or rut, which caused her to lose control of her automobile. This Court has previously dealt with the question of the necessity of claimant to produce evidence sufficient to satisfy the Court in regard to the proof of the elements required in order to establish liability on the part of the state. In *Dominic Di Orio* vs. *State of Illinois*, 20 C.C.R. 53, the Court stated:

"It would establish a dangerous precedent for this Court to hold that the state would be liable for all defects on a highway, which it was under a duty to maintain. There is no evidence in this record of the nature of the hole, its size, how long it had been there, how it had been created, or of any notice to the state of its existence, either actual or constructive. There is, therefore, nothing in the record to show that the respondent was guilty of any negligence. To hold that the state would be liable without notice, actual or constructive, would be making the state an insurer.

This Court, by prior decision, is committed to the rule that the evidence must show that the state had actual or constructive notice of the defect, and negligently failed to take precaution to protect the traveling public. (*Dockery* vs. *State of Illinois*, 18 C.C.R. 177)."

In the instant case, claimant has not, at least to our satisfaction, borne the burden of proving her case. In *Flint* vs. *State of Illinois*, 21 C.C.R. 80, a case similar to this one, it was stated at pages 82 and 83:

"This Court must determine both the law and the facts in a case. Unlike courts of review, we cannot say, 'it is for the jury', nor can we avoid our fact finding duties, as trial courts are able to do in jury cases."

In deciding this case, we have attempted to apply the facts to the law, as we understand them both to be, and have concluded that the record in this case does not

justify our finding for claimant. This claim is, therefore, denied.

## OPINION ON REHEARING

Claimant, Leota Anderson, in her complaint alleges that the State of Illinois negligently maintained the floor of the McDonough Street bridge, which crosses the Deep Waterway in the City of Joliet, Illinois. It further alleges that, while driving across said bridge on April 30, 1953, her automobile was thrown out of control, due to a defect in the bridge floor, and into and against the steel upright of the bridge. She sustained personal injuries, for which she claims the sum of $6,500.00, and damages to her automobile, for which she claims the sum of $612.00.

Her complaint alleges the following acts of negligence on the part of respondent:

"(a) Negligently and carelessly permitted large holes to remain and exist in the floor of said bridge;
(b) Negligently and carelessly permitted deep ruts and other irregularities to be and remain in the floor of said bridge;
(c) Negligently and carelessly maintained or failed to maintain the floor of said bridge."

She further alleges that this condition had existed for a considerable period of time prior to the accident, and that respondent knew or should have known of the existence of the defect, which she claims caused the accident.

Respondent filed no answer to the complaint, and, under Court of Claims Rule No. 11, a general denial of the facts set forth in the complaint is considered filed.

It is well established that the State of Illinois does not act as an insurer in the maintenance of its highways and bridges. Respondent can be held responsible in this

case only if it is established by the greater weight of the evidence that claimant, while in the exercise of due care and caution, was injured and damaged as the proximate result of a defect, which made the bridge dangerous and unsafe for ordinary travel, and that the state had actual or constructive notice of the defect, and was negligent in allowing such defect to remain uncorrected.

Upon the first trial of the cause, claimant failed to prove her case, due primarily to the total lack of evidence sufficient to establish that respondent had actual or constructive notice of the alleged defect. Subsequent to the denial of the claim by this Court, in a written opinion heretofore filed, a new trial was granted claimant on the ground of newly discovered evidence bearing upon this essential factor.

The facts concerning the accident and the defect complained of, as shown by the record now before the Court, are as follows:

Claimant was employed by the Caterpillar Tractor Company as secretary to the manager. On the 30th of April, 1953, at approximately 5:00 P. M., she was driving her Ford sedan automobile at approximately 10 miles per hour across the McDonough Street bridge going home from work. At the time she crossed the bridge it was raining quite hard, and the traffic was very heavy going east, the direction in which she was traveling. She was approximately ten feet behind the automobile proceeding immediately in front of her. She testified that, as she approached and came to the center of the bridge in second gear, the left front wheel of her automobile caught in a deep rut in the road, which caused the steering wheel to spin out of her hand, and the automobile to swerve out of control across the 16 foot roadway, over

a curb 10 inches in heighth, and into a steel upright on the north side of the bridge. She hit the windshield, and lost consciousness.

She further testified that, when she lost control of her automobile, she applied her brakes, and her automobile slid into the upright after going over the curb.

Two sets of streetcar tracks run along the bridge, one eastbound and the other westbound. Claimant testified that the left wheels were to the right of the north or inside rail of the eastbound tracks at the time she lost control of her automobile.

Claimant's exhibits Nos. 2 and 3, which are photographs of the automobile, indicate a substantial amount of damage at the point of impact, which appears to be squarely in the middle of the front bumper.

The claimant, on being recalled by her attorney to testify, identified the rut, which she referred to in claimant's exhibt No. 7, and circled it in ink.

From an examination of exhibit No. 7, which is a photograph taken on May 1, 1953, and identified by claimant as correctly portraying the condition of the bridge floor on that date, we note the place encircled. There appears to be a small hole or break in the wooden bridge floor near the north rail of the streetcar track. The photograph, however, is of no help in determining the size and character of the hole or break. It is impossible for us to tell from viewing the photograph whether it was a defect of recent or long standing origin, or whether it was of sufficient size to catch the wheel of claimant's automobile and cause it to go out of control. Nowhere in the record of the first hearing was there any further testimony concerning the character of this hole or break.

On the re-trial, however, William Daggett, a Police Sergeant of the City of Joliet, assigned to the Traffic Division, testified that he came upon the scene of the accident shortly after it occurred, and before either the claimant or her automobile had been moved.

He testified that the defect circled by claimant on her exhibit No. 7 was a hole, approximately one and one-half or two feet long, about four or five inches wide, and about three or four inches deep. He further stated that he observed a skid mark running from the hole in the bridge floor to that portion of the bridge where the left front of claimant's automobile struck the bridge girder.

He also testified that, about two weeks prior to the accident in question, he was driving his own private automobile over the bridge, and hit the same hole, ripping his tire. He had observed the condition of the bridge, and stated that it was, on the day in question, in very poor condition, and had been in a bad state of repair for approximately one month prior to the accident, and that the Police Department had received numerous complaints about its condition.

It appears from the record that the surface of the bridge had, for some while, been deteriorating. It was constructed of wood, and had, in some places, been patched by iron plates. Respondent's exhibit No. 2, the Departmental Report, established that respondent had, on April 12, 1952, awarded a contract for the removal of the wooden floor and replacement of it with a steel grid floor, but, due to the shortage of steel, the contractor had been unable to secure materials, and commence work until May 27, 1953.

Claimant offered another exhibit, marked No. 5, to show the character of the bridge floor, and also to prove notice to respondent of the bridge floor condition. This exhibit was a photograph, published in the Joliet Herald News on Sunday, April 12, 1953, showing the bridge surface, and calling attention to the fact that the deterioration of the flooring had made the bridge so bumpy that cars bounced about when crossing it.

Although the exhibits are not in and of themselves sufficient to establish constructive notice of the particular defect complained of, the testimony of William Daggett does, in our judgment, coupled with the exhibits, sufficiently establish this indispensable element, which must be proven by claimants in this type of cases.

In our judgment, the record now establishes that respondent had sufficient time to become apprised of the existence of this defect, and should have repaired it, inasmuch as it was of sufficient size to constitute a danger to the traveling public.

With respect to the question of due care upon the part of claimant, we find that the record is sufficient to establish this element. Due to the rain and traffic at the time of the accident, it is understandable that she did not see the hole in time to avoid it.

We, therefore, believe that the record now contains sufficient evidence to support claimant's contention that the accident was the proximate result of negligence on the part of respondent, and, therefore, will consider the question of damages.

The injuries received by claimant consisted of cuts upon her forehead and both knees. She was rendered unconscious when her automobile struck the girder. She received emergency treatment at St. Joseph's Hospital in

Joliet, and was confined to her home for ten days. She then returned to work, and has been working ever since.

Dr. I. Joshua Speigel examined claimant on May 31, 1956, pursuant to an order of this Court, and found that she had suffered a mild cerebral concussion, and has a numbness of the right side of her forehead, which is present at all times. He found that the numbness was caused by trauma to the supraorbital nerve, which has resulted in "paralysis, partial, supraorbital nerve (right) secondary to traumatic neuritis", and, in his opinion, the condition is permanent, which neither medical nor surgical treatment can change.

He found that she has made a "relatively gratifying recovery", and now "has only occassional mild headaches on the right side of the head", the type of which comes under the heading of a group of symptoms known as "Post-Concussional Syndrome", with respect to which no definite prognosis can be made.

Dr. Speigel also reported that he performed a detailed neurological examination upon claimant. His report indicates he found her to be intelligent, bright, alert, cooperative, pleasant, and well oriented in all spheres.

He noted a "well healed transverse laceration above the right supraciliary ridge, and above this was a small three inch square area of hypalgesia and hypesthesia. There was a peculiar bluish ridge above the scar extending upwards and ending in a bluish discoloration". He further reported that "the laceration of the scalp is now healed, and is in and of itself not a source of disability other than cosmetically". He noted no other symptoms with the exception that claimant complained that she "has pain in the knees from time to time".

The only other medical evidence offered by claimant in the record was the testimony of Dr. Albert C. Field, Oak Park, Illinois, who examined claimant once on December 5, 1953, sixteen days prior to the first hearing of the cause.

Her treating physician, Dr. Lofdahl, was not called as a witness either at the first hearing or the second hearing.

Dr. Field's testimony with respect to the condition of claimant's knees was that upon each was a scar, and that there was some limitation of flexion of the left knee; that the semi-lunar cartilage was injured, and that he "thought" the condition was permanent.

He further stated that it was then too early to make a definite prognosis as to whether or not the cartilage should be removed by surgery, but that she should be kept under observation, and, if pain and limitation persisted, surgery would be indicated.

On cross-examination, he acknowledged, in answer to a line of questioning relative to permanency, that he did not know whether she would have improvement or not.

His only expressed basis for finding that the cartilage was damaged was "a limitation of extension, pain, rigidity, and muscle spasms in the knee joint at the time of examination, and a pain located over the head of the tibia".

Claimant herself testified only at the original hearing on December 21, 1953, and was present before the Court in compliance with its order on October 26, 1956.

In her testimony at the original hearing she testified that her salary at that time was $100.00 per week; that she lost two weeks time from her employment; that she incurred medical expense of $30.00 for treatment by Dr.

G. A. Lofdahl, her family physician, by reason of the accident; that she could not bend her left knee all the way, and that the right knee was "the same but not quite as bad", and that the knees pained her; that the right forehead area was numb; that she had headaches, was nervous, and suffered spells of dizziness; that she was examined by Dr. Field at the request of her attorney; and that the cost of repairing her automobile was $612.00, which she had paid to the Joliet Motor Sales on September 9, 1953.

Claimant acknowledged before the Court on October 26, 1956 that there has been no further medical treatment with respect to her knee condition. The scar on that date did not appear to the Court to be greatly disfiguring, although it was visible at close range.

It is difficult for us to fix money damages in this case. The main complaint appears to be the numbness of the right forehead, which, although discomforting, does not appear from the record to affect claimant adversely.

She does, however, continue to have occasional headaches, which respond to medication, and does still complain that her knees pain her to some extent.

It appears to us, however, that, inasmuch as nothing further has been done with respect to the knee condition for more than three years, when, from Dr. Field's testimony, surgery could be resorted to, apparently the condition falls considerably short of being a disabling one. We feel that expressions of pain, unaccompanied by more definite and recent medical testimony, are of little probative value, and can not support a large recovery for that particular injury.

We believe that, upon the record furnished us in this case, an award for the special damages sustained,

being loss of earnings $200.00, medical expenses $30.00, and damages to automobile $612.00, a total of $842.00, plus an additional sum of $1,500.00 for personal injuries sustained, is ample.

Wherefore, the claim in hereby allowed in the sum of $2,342.00.