(No. 87-CC-3893–

TIMOTHY KRAEMER, Claimant, v. THE STATE OF ILLINOIS, Respondent.

*Opinion filed June 25, 1990.*

DIANA LENIK, for Claimant.

NEIL F. HARTIGAN, Attorney General (GREGORY T. RIDDLE, Assistant Attorney General, of counsel), for Respondent.

MONTANA, C.J.

Claimant, Timothy Kraemer, sued the State of Illinois for personal injuries he suffered on June 10, 1985. He alleged that he was injured and suffered damages when his motorcycle crashed as he missed the last turn while eastbound on Anthony Drive near Columbia Trailer Park in Champaign County, Illinois. He further alleged the State was negligent in not properly posting signs and markers warning of the turn and allowing trees to obscure what signs were in the vicinity.

The hearing was held before Commissioner Robert Frederick. The evidence consists of the transcript of testimony, the evidence deposition of David Morgan,

the evidence deposition of Christopher Billing, the evidence deposition of Dr. Adolph Lo, Claimant's Group Exhibit 1 (pictures), Claimant's Group Exhibit 2, Claimant's Exhibits 3 and 4, Claimant's Group Exhibit 5, and a stipulation marked Exhibit 6. Both parties have filed their briefs and Commissioner Frederick has duly filed his report. Oral argument was held before the judges of the Court of Claims on May 8, 1990.

On June 9, 1985, Claimant spent most of the day with one Chetina Murphy, the house manager of a local restaurant. Ms. Murphy was a subpoenaed witness who did not want to testify against Claimant. During the afternoon of June 9, 1985, she went to a pig roast at a local tavern with Claimant and later that night went to another tavern, "The Alley Cat," with Claimant. During the afternoon both she and Claimant were drinking intoxicating liquors. She was drinking beer but does not remember what Claimant drank. After 9:00 p.m. on June 9, 1985, Murphy and Claimant arrived at "The Alley Cat." They stayed at this tavern until closing time between 1:00 a.m. and 1:30 a.m. on June 10, 1985. Near closing time Claimant and Murphy planned to go to one Linda Payne's house with some other people who were also at the tavern. Murphy rode on the back of Claimant's motorcycle. She further testified that Claimant was under the influence of alcohol when he left "The Alley Cat," but she did not say to what extent. Claimant testified he may have had two beers at "The Alley Cat" and possibly could have had more. Murphy believed she was drunk while riding on the back of Claimant's motorcycle and she further believed Claimant was driving too fast to make the curve where the accident at issue took place. Murphy rode behind Claimant on the motorcycle and hung onto Claimant's sides.

Claimant's motorcycle was a 1976 black Kawasaki which was in good working condition on the date of the accident. Also, it had new tires. Claimant testified that his motorcycle was a dangerous vehicle as it was on two wheels and balance must be kept. When Claimant left "The Alley Cat," he was following a car because he did not know where Linda Payne lived. He did not believe he was under the influence of alcohol. He proceeded to follow the vehicle across town on University Avenue to Cunningham, went north on Cunningham under the interstate highway, and then took a right at the first stoplight which was the frontage road. This was Claimant's first time driving on this road. According to Claimant, as he drove down the frontage road he was going 30 to 35 miles per hour. When he came up to the first turn he slowed to make the turn, sped up a little bit, saw the next curve sign after he got past a tree so he slowed down to make that turn and then sped up a little bit more. Since there was no sign, he did not think there was a curve and then he was on the curve before he knew what had happened. He had observed the brake lights of the car he was following go on and he let off the gas to slow down, but did not use the brake. As he entered the last curve, he tried to stop by braking but could not stop and he slid into a fence. The motorcycle climbed the fence and fell back over on Claimant. The second curve sign was obscured by a tree and he could not see that sign until he was even with it. The road was bumpy and had loose gravel on it. There were signs for the first two curves and speed limit signs on the frontage road, but no signs for the third curve.

The pictures of the frontage road indicate a two-lane roadway to the north of Interstate 74. The roadway has clearly marked lanes. The first turn is not shown in Group Exhibit 1. The second turn is preceded by a

straightaway of several hundred yards. The speed on the straightaway is posted at 35 m.p.h. The curve is a left-hand curve. A large overhead sign indicating an exit on the Interstate is just to the right of the curve and the sign goes over the Interstate. There is a curve sign just before the second curve which is obscured by a tree.

The third curve, where the accident occurred, appears to be about 200 feet after the second curve. There are large, overhead lights on the Interstate just to the right of the curve. There is no curve sign preceding this curve. This curve also curves to the left and is a sharp curve. At the end of the last curve is a stop sign. Just past the middle of the last curve is a sign that says Columbia Village which was Claimant's destination.

Michael Fancher, Claimant's witness, testified that he left "The Alley Cat" at closing time with two women and he talked with Claimant and Chetina Murphy in the parking lot. He had two beers at "The Alley Cat." They all decided to go to Linda Payne's house to socialize. He was riding his own motorcycle. Claimant was going to follow Fancher to Payne's house. Mr. Fancher had only been there one prior time. He testified that the frontage road was dark, had loose gravel on the sides of the road, and was a little bumpy and angled. He had driven this road once or twice before. He stated that as the road was bumpy it was hard to handle the motorcycle. He was driving 30 miles per hour and Claimant was behind him. This witness successfully made the left-hand turn on the last curve. As he did, he heard Claimant put on his brakes and squeal them. He went back and saw Claimant lying on the ground under his motorcycle.

Linda Payne testified that everyone was going to her house. She believed she may have had a couple of wine coolers at "The Alley Cat" during the hours she was

241

there. She was following Claimant and Fancher. As she turned on to the frontage road she slowed her speed and was going 30 miles per hour. She stated she always goes slow because the road is slanted off to the sides and there is loose gravel. The road had remained the same since she moved into her home in 1983. She said there is a curve sign at the first curve and a speed limit sign, but no other signs, and the only lighting on the frontage road comes from the interstate. The interstate is about 10 feet from the frontage road. The interstate traffic goes west while they were going east on the frontage road and the headlights off the interstate traffic can cause a glare, she said. She was four to five car lengths behind Claimant but not see the accident. Ms. Payne indicated that prior to the accident Claimant was driving fine.

Christopher Billing testified as Claimant's expert. Mr. Billing is a civil engineer, from Berns, Clancy & Associates, and had been for 11 years. He was a project engineer for that firm. Mr. Billing had substantial qualifications as an engineer. He had attended annual traffic safety institutes and had substantial experience on traffic-related cases. He examined the frontage road where Claimant drove and the accident occurred, in Champaign County, Illinois. He noted the roadway was a two-lane oil and chip surface, curb and gutter on one side, and shoulders and roadside ditches on the other side. Between the interstate and frontage road is a chainlink fence. He described the road as typical of a frontage road. He said there are three turns on this road, the accident happening on the third and last turn, near the entrance into Columbia Village Trailer Park. The Department of Transportation has the responsibility to maintain the frontage road. The third turn where the accident occurred is a sharper turn than the first two, he observed.

Mr. Billing calculated that a safe speed for the first two turns would be 30 miles per hour and for the last turn where the accident occurred, a safe speed would be 20 miles per hour. The only signs for speed however on the frontage road were for 35 miles per hour and there was no warning sign for the last turn. In reviewing the standard applications of signing which are directed by both the Federal Department of Transportation and the State Department of Transportation through their manuals on uniform traffic control devices, Mr. Billing found that on the frontage road some signs were inappropriately located and some signs were not posted at all. There was no signing indicating the last turn by the trailer park posted. He said the warning sign at the second curve was posted too close to the curve so as not to give appropriate warning to the motorist. At the last turn, he testified, an advance warning sign with a 20 m.p.h. advisory speed plate should be posted in advance of the turn, an advance warning of the approaching stop sign should be erected, and a large arrow turn sign should also be placed to mark the physical location of the turn, particularly at night. Other lighting at the last turn would also certainly help make the road safer, he said. While all of these safety measures were appropriate, none were required by the manuals. Claimant's expert felt the frontage road in this case to be an extra-hazardous situation. However, this conclusion was not supported by any studies of the number of vehicles using the road and the number of reported accidents and he further admitted that the manuals he cited stated what sign to use in a situation and not when a sign must be used. The manuals rely on engineering judgment as to when a road condition is to be posted. The manuals are not regulatory or statutory.

While this expert did not believe the frontage road

had a combination curve, the road fit the definition in the manual. He also admitted that a large arrow sign at the curve to mark the curve would not meet the 500-foot effectiveness requirement of the manual because the distance from the second curve to the third curve is less than 500 feet.

David Morgan, a transportation operations technician for the Department of Transportation, testified for the State. He was a certified engineering technician but he was not a registered engineer. He was responsible for the signing and striping of the highways in District 5 where the frontage road at issue is located. He had been in this position for 17 years and he prepared plans and work orders for all signing in the district.

Mr. Morgan testified that the frontage road has curves and not turns and that the second and third curves were a combination curve because only 200 feet separated the two curves. Under the Federal manual, it fit the definition of a short length of tangent, was therefore a combination curve, and could be signed with one curve sign as was done on the frontage road. He also testified that a stop ahead sign was not required because the stop sign at the end of the last curve was visible for 175 feet as required. All that is required at 35 m.p.h., is that a stop sign be visible for 150 feet. He further testified there was nothing in the manuals to require additional lighting or a large arrow sign or a speed limit reduction sign. In addition, he said the striping on the road was in good condition and reflectorized and was visible at night. On the frontage road on the date of the accident, the required signs were in place. The stop sign was the responsibility of the trailer park and not the State's responsibility. Mr. Morgan believed that the signing on the frontage road was not the cause of Claim-

ant's accident as all of the signing and striping that existed conformed with the manuals.

Mr. Morgan also testified that while changing of signing does occur on roadways due to changed circumstances and rates of accidents, no statistics as to accident rates on frontage roads are kept except where the roads intersect a State or Federal road. The State had no accident statistics for this stretch of frontage road. He had seen this stretch of frontage road two to three times a year. It was his judgment that there is a combination curve, but that a professional engineer may very well have the opinion it was not a combination curve. He further testified he did not see the curve sign blocked by trees when he looked at the scene in October of 1985.

After the accident, an ambulance came and took Claimant to the hospital. He suffered seven broken ribs, a punctured lung, and a broken collar bone. Claimant's Group Exhibit 5 shows the scrapes, cuts, bruises and scarring suffered by Claimant. Dr. Adolph Lo testified that he attended the medical treatment of Claimant. Surgery was required and a bronchoscopy was performed on June 11, 1985. Dr. Lo further testified that the medical records indicate Claimant's blood-alcohol level was .14. Claimant was in intensive care a week and remained in hospital care for an additional two weeks. When released, he could barely walk and suffered great pain. At the hearing on December 2, 1988, he still suffered pain whenever he would turn to his left or bend over very far.

In total, Claimant missed 18 weeks of work as an installer for a heating and air conditioning company. He was earning $7.25 per hour and worked 50 to 51 hours per week. His lost wages totalled $7,178.40. His total medical bills were $19,532.91. The damage to his motor-

cycle was approximately $500. Claimant also considers as part of his damages that he "had to pay for the fence that I damaged." The Department of Transportation sent Claimant a bill for $233.88 for damages to the fence that he struck with his motorcycle.

All of the medical bills of Claimant and the repair bills on the motorcycle were paid by his insurance company. Claimant also received township aid for food and personal items which was $154 per month for about three or four months.

As this Court has stated numerous times, the State is not an insurer of all persons traveling upon its highways. (*Bloom v. State* (1957), 22 Ill. Ct. Cl. 582, 584; *Edwards v. State* (1984), 36 Ill. Ct. Cl. 10, 15.) For liability to be imposed upon the State, Claimant must prove by a preponderance of the evidence that the State breached its duty of reasonable care and the negligence flowing from the breach proximately caused the accident and Claimant's injuries. *Brochman v. State* (1975), 31 Ill. Ct. Cl. 53, 56.

It is the duty of the State to exercise reasonable care in the maintenance and care of its highways in order that defective and dangerous conditions likely to injure persons lawfully on the highways shall not exist. (*Webee v. State* (1985), 38 Ill. Ct. Cl. 164, 167.) The exercise of reasonable care requires the State to keep its highways reasonably safe. If the highways are in a dangerously defective condition and therefore not reasonably safe and the State is on notice of such condition, the State is negligent if it does not notify or warn the public of such condition. (*Moldenhauer v. State* (1978), 32 Ill. Ct. Cl. 514, 522.) The State is under a duty to give warning on highways by erecting proper and adequate signs at a reasonable distance from a dangerous condition of

which it has notice, and failure to erect such signs constitutes negligence. *Starcher v. State* (1983), 36 Ill. Ct. Cl. 144, 146.

The Court of Claims has adopted the doctrine of comparative negligence and any recovery would be reduced pursuant to the terms of such doctrine. (*Peterson v. State* (1983), 37 Ill. Ct. Cl. 104.) The adoption of the doctrine of comparative negligence in the State of Illinois did not extinguish the requirement of proximate cause. Failure to establish proximate cause of an injury precludes liability, negating the need to compare fault. *Harris v. State* (1986), 39 Ill. Ct. Cl. 176, 179.

On the facts of this case, Claimant has failed to prove a case wherein he may prevail. The question of the State's negligence is the closest issue. The Claimant's witness tried to show that the last curve was a dangerous curve. Claimant's expert was impressive. However, the dangerous condition must be the cause of the accident. In the present case, Claimant was driving a motorcycle which he testified was dangerous and required balance. He proceeded to drive with a person admittedly drunk on the passenger seat behind him, holding on to him, and after he had been drinking alcoholic beverages. The passenger testified that Claimant was under the influence of alcohol and took the curve too fast. Additionally, Claimant was following another motorcyclist who drove through the curve without incident and Claimant admitted he observed that motorcycle's brake lights come on prior to the curve yet when he approached the curve, he only let off the gas to slow and did not use his brakes. It is also very important to note that, under the manuals, the State had not violated any mandatory signing provisions. All of the signs posted

were appropriate though experts could legitimately disagree as to what signs were actually required.

The final act of importance is that even if the signing was defective, the roadway was properly striped. It is uncontradicted that the roadway was striped in good condition, reflectorized, and visible at night. The pictures of the last curve show the striping. Following the striping and the motorcycle in front of him, Claimant should have driven through the curve without incident if he were not under the influence of alcohol with a person admittedly drunk holding on to his sides.

Based on the foregoing, we find that this claim must be denied due to Claimant's failure to prove that the condition of the roadway where the accident occurred, including the signing existing at the time of the accident, was the proximate cause of the accident. It is therefore hereby ordered that this claim be, and is, hereby denied.