(No. 94-CC-0811-

HAROLD STOJENTIN, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed December 7, 1999.*

SANDMAN, LEVY & PETRICH (MICHAEL P. HOLVERSON, of counsel), for Claimant.

JIM RYAN, Attorney General (DAN MILLS, Assistant Attorney General, of counsel), for Respondent.

## OPINION

MITCHELL, J.

This cause is before the Court on the complaint at law of Claimant, Harold Stojentin, seeking the sum of $100,000 from Respondent, State of Illinois, allegedly for injuries sustained when Claimant tripped and fell as a result of stepping into and upon broken and defective pavement on Irving Park Road in the city of Chicago on November 3, 1992. Jurisdiction of this tort claim arises from section 8(d) of the Court of Claims Act (705 ILCS 505/8(d).) On January 24, 1995, an order was entered allowing Claimant to file his amended complaint.

Claimant complains that Respondent: (a) had a duty to exercise ordinary care in the maintenance of the street; (b) negligently failed to make regular inspections of the street, to repair the broken and defective pavement; and (c) knew, or in the exercise of ordinary care should have known, that the dangerous condition existed for a long period of time.

### I. Procedural Background

There are several procedural issues that developed prior to the hearing in this matter that may affect the admissibility of evidence or the other rights or obligations of the parties.

A. Respondent's Motion to Dismiss, or in the Alternative Respondent's Affirmative Defense.

On February 27, 1998, Respondent filed Respondent's motion to dismiss, or in the alternative Respondent's

affirmative defense, stating as a basis that Respondent did not owe a duty of care to Claimant, and Claimant failed to exhaust his remedies. In support, Respondent cited *Connolly v. State*, Ct. of Claims No. 88-CC-0563, for the proposition that the State has no duty to maintain pedestrian sidewalks, crosswalks or other pedestrian related facility or service within a municipality, and that a duty would only be owed to vehicular traffic. In support of the failure to exhaust remedies argument, Respondent asserted that the State's maintenance responsibility extends primarily to the vehicle travel lanes, and at a minimum, the City of Chicago and the State have a joint responsibility to maintain the parking lanes, including the crosswalk area.

This matter was previously set for a hearing to commence on March 5, 1998, and the parties had their witnesses lined up; therefore the hearing was conducted without objection by either party.

B. Amendment to Amended Complaint at Law.

On the morning of the hearing, Claimant presented a motion for leave to file an amendment to complaint at law, *instanter*. The amendment was to amend paragraphs 15 and 16 of the amended complaint.

Respondent objected because the amendment amended the bill of particulars to include medical services and lost earnings arising out of a back condition. The motion was granted in part in relation to paragraph 15 and in total in relation to paragraph 16.

It was ruled that the Court would not consider certain language proposed in the amendment to paragraph 15 as evidence of the lack of maintenance responsibility by the city of Chicago unless evidence was presented at the hearing. The amendment to paragraph 16 amended

the bill of particulars, pleading that Claimant had incurred a total of $14,863 in medical expenses, had experienced $32,334.12 in lost earnings, had $65.33 in other expenses, and had pain and suffering equivalent to $100,000, for a total of $147,262.65 in alleged damages.

C. Payment of Dr. Scott A. Seymour's time for a continuation of his evidence deposition.

Claimant conducted an evidence deposition of Dr. Scott A. Seymour on February 24, 1998. Respondent was not in attendance and the assistant Attorney General ("AAG") alleged that Claimant had not provided proper notice. The parties ultimately agreed on allowing Respondent to review the evidence deposition transcript and to permit the AAG the opportunity to conduct a "continuation" of the evidence deposition. At the hearing the parties did not agree on which party would pay the deponent's fee for the time of the continuation of the deposition. Respondent orally moved to compel Claimant to pay the fee. Claimant filed a response to motion and respondent filed Respondent's reply in support of its motion to compel claimant to pay evidence deposition fees of Dr. Seymour. Neither party raised this issue in their briefs.

D. The Admissibility of the Evidence Deposition of Dr. Theodore Balsam.

Respondent conducted an evidence deposition of Dr. Theodore Balsam on March 3, 1998, and moved to have it admitted at the hearing. (Respondent's Exhibit No. 1.) Claimant objected, based upon lack of proper notice and upon the rule set forth in *Petrillo v. Syntex Laboratories, Inc.* (4th Dist. 1986), 148 Ill. App. 3d 581. The transcript was admitted over the objection. The parties were invited to address the issue for possible reconsideration. Claimant filed a motion for reconsideration. Respondent did not file a response.

The purpose of Dr. Balsam's testimony was to authenticate Dr. Keagy's signature on a letter to Dr. Balsam, thereby allowing Respondent to offer the letter into evidence. The AAG had intended on deposing Dr. Keagy but learned that he was dead.

The Court is troubled by the fact that the AAG does not dispute the assertion that Claimant's counsel only received oral notice approximately two hours prior to the deposition. The AAG stated that she had subpoenaed Dr. Balsam for his testimony at trial. He had just returned from out of the country on March 3, orally protested the time frame to the AAG, and requested another method of giving the testimony. Neither party addressed this issue, or any evidence arising out of the deposition, in their Briefs.

## II.  Claimants Case In Chief

### A.  Testimony of Claimant, Harold Stojentin.

#### 1.  Liability.

Claimant, Harold Stojentin, testified that he has been a police officer for the city of Chicago since 1973. At the time of the incident he was a Chicago police officer earning $3,800 a month and was also working as a security guard at Taft High School. He began working at the school two years prior to the incident. At Taft, he worked approximately 20 hours a week during the school year and was paid a little over $10 per hour.

Prior to the incident, Claimant had not injured his right heel. On November 3, 1992, he left his house at about 7:00 a.m. It was election day. He and his wife were going to vote. His wife later dropped him off at Irving Park Bank, located at the northwest corner of Marmora and Irving Park Road. His wife left to go to work and he started walking home. He walked southbound on Marmora to

Irving Park Road. He had not ever been on foot at that location prior to that morning. It was about 8:30 a.m. There was a stop sign on the south side of Irving Park for traffic northbound on Marmora. There were no traffic controls or signs for traffic on Irving Park. There were no other pedestrians. He was at the northwest corner. A vehicle traveling southbound on Marmora arrived at the intersection. The vehicle had its right turn signal on to go westbound on to Irving Park. Claimant was on the sidewalk preparing to cross Irving Park at the crosswalk. The driver of the vehicle gave Claimant a hand motion, indicating Claimant could go ahead and cross the street. Claimant looked in both directions to make sure that it was clear for him to cross.

At the point where Claimant was crossing, Irving Park was two lanes in both directions. He stepped off the curb with his right foot and fell. When he stepped into the street, he put his weight down on his right foot and his ankle rolled over. He fell to his right side. He pushed himself back on to the curb using his hands and left foot.

The driver of the vehicle stopped and drove Claimant home. Prior to leaving, Claimant glanced at the crosswalk and observed a hole in the middle of the two crosswalk lines.

Claimant identified seven photographs at the scene at the intersection of Marmora and Irving Park. (Claimant's Exhibit Nos. 1-7.) Claimant's Exhibit No. 3 is facing southbound and shows the northwest corner at which Claimant was standing before stepping into the street. Claimant's Exhibit Nos. 2 through 7 accurately portray the hole he stepped into. He recalled that the hole was "approximately 2 feet wide, or across, approximately a foot out from where [he] stepped down, and roughly 2 inches, maybe deeper." He had not seen the hole before he fell. At the time he put himself in motion to cross the

street, his attention was directed on the east and westbound traffic on Irving Park. The traffic flow on Irving Park is pretty heavy during rush hour, which was the time of day he was crossing. Claimant later learned that Frank Blume was the name of the person who drove him home. Mr. Blume is deceased.

2. Injuries.

a. Ankle and Heel.

Claimant was in a lot of pain when he arrived at his house after the incident. His ankle was quite swollen. He hopped on his left foot to his car and drove to the hospital. He went to the emergency room at Our Lady of Resurrection. His right foot was x-rayed. He was told his heel was broken. An ace bandage was put on it and he received a prescription for medication. He was released from the hospital and referred to the D'Silva Clinic. Dr. Seymour of the D'Silva Clinic later provided medical care and treatment. Dr. Seymour determined that the heel was broken and put a cast on it on November 4. Claimant identified a photograph of the cast on his right foot. (Claimant's Exhibit No. 8.) The cast was on his foot for approximately four weeks. He utilized crutches during the four week period. After the cast was removed, Dr. Seymour told him the heel was healing. Claimant returned to work on January 3, 1993.

Claimant experiences pain, some throbbing and a lot of stiffness in his heel with just about every weather change, such as humidity, dampness, coldness and barometric pressure. When he experiences pain, he rests and that seems to help.

b. Back.

Claimant experienced pain and numbness with his lower back within days of the incident. He had periods of

spasms and problems with his back commencing in 1985 or 1986. He visited Dr. Saddy prior to the incident. He traced his back problems to an injury he suffered in Vietnam. He went to Dr. Saddy on November 6, 1992, and visited him every couple of days for two or three months. Dr. Saddy would examine him, massage and adjust his back. In February, 1993, he and Dr. Saddy determined that the treatments were of no further use.

In April, 1993, Claimant went to Dr. Keagy. He received two injections of cortisone. He then went to a podiatrist, Dr. Jacobsen. He was referred to Dr. Sirajullah.

Claimant went to Dr. Stamelos, an orthopedic surgeon concentrating his practice on backs, on May 5, 1993. Dr. Stamelos prescribed an MRI. Dr. Stamelos advised rest and slight exercise. He advised Claimant to remain off work for some time. He returned to work on May 26, 1993. Dr. Stamelos performed laser surgery on Claimant's lower back on August 26, 1993, at Holy Family. Dr. Stamelos prescribed physical therapy for Claimant after surgery. He attended four physical therapy treatments. He still performs the exercises he learned during those treatments. He last saw Dr. Stamelos when his back bothered him in August, 1997.

Claimant has pain in his lower back area sometimes on a weekly basis. He experiences pain in his lower back at least once per month. He does stretching exercises for relief. He takes aspirin for the pain. For three months following his surgery, Dr. Stamelos prescribed medication.

3. Damages.

Claimant identified Claimant's Exhibits Nos. 9-22 as the bills that he received for the care and treatment for the injuries sustained to his heel and back since the November 3 incident. He purchased jogging outfits to wear

while he was home with the cast on his foot. (Claimant's Exhibit No. 23.) He also purchased a long extension cord for his telephone to limit his running back and forth to the telephone. Claimant's Exhibit No. 24.

Claimant was earning $3,424.50 per month with the Chicago Police Department at the time of the incident and during the two month period he was off work. (Claimant's Exhibit No. 25.) Claimant was off work during various times between April, 1993 and January 13, 1994. (Claimant's Exhibit No. 26.) He was off work on the advice of Dr. Stamelos for two weeks in August, 1997, because of an aggravation of the problem with his lower back. Claimant produced pay stubs to show that he was earning $4,358.50 per month in August, 1997. Claimant's Group Exhibit No. 27.

4. Cross-Examination.

On cross-examination, Claimant acknowledged that he did not look where he was placing his foot when he stepped into the street. He did not look down to judge the size of the curb. He did not see the pothole as he approached the corner.

Claimant hurt his back when he was thrown from a jeep in Vietnam and had several episodes of lower back pain prior to November, 1992. Claimant's back went out in 1986 when he was carrying plywood and he had an unbelievable amount of pain. He visited a chiropractor prior to 1992 for adjustment and manipulation. His back went out six or eight times between 1986 and November, 1992.

Claimant was not able to return to his part-time job at Taft High School following the incident, because they knew he was going to be out for awhile and hired another person.

B. Testimony of Paul Peterlin.

Mr. Paul E. Peterlin testified that he is familiar with the area of Irving Park and Marmora Avenue. He had lived within a block or two of the intersection at the time of the incident and for at least a decade prior to November, 1992. He did business with the bank, the dry cleaners and a grocery store on Irving Park west of Marmora. He traveled to these businesses on foot. He identified the location of the businesses on Claimant's Exhibit No. 2. He visited the area of Irving Park and Marmora a couple of times a week at the end of 1992, and was acquainted with the condition of the street at the northwest corner of Marmora and Irving Park in the crosswalk.

During 1992, there was a hole immediately next to the curb in the crosswalk on the northwest corner. He reviewed the photographs (Claimant's Exhibit Nos. 2 through 7), stating that the hole was in the right place but "it looked a little shallow compared to what [he had] seen it in the past." He remembered it being "about 8 to 10 inches wide, maybe 18 or 20 inches long [and] 4, maybe 5 inches" deep. Its depth depended on the time of the year and the weather conditions. He was aware of the hole existing for a year or two prior to December 31, 1992. The hole, that existed during 1992, was deeper than as depicted in Claimant's Exhibit No. 4. Prior to moving out of the area, sometime in 1993, the hole "had been patched and the patch had come out in part of it."

On cross-examination, Mr. Peterlin acknowledged that Marmora is one-way northbound. He did not know if Marmora was one way northbound proceeding north of Irving Park. He could not say that he saw the pothole in Claimant's Exhibit No. 4, on November 1, 2 or 3, 1992. He did not call the Department of Transportation, city of Chicago or city police, or any official to complain about the pothole.

C.  Testimony of Frank Klupshas.

Mr. Frank Klupshas, an adverse witness, testified that he has been employed by the Department of Transportation since 1968. Since October of 1979, he has been assigned to the facility at 4051 North Harlem, Chicago, and the intersection in question has been within his jurisdiction the entire time.

When asked what type of examinations or surveys conducted on Irving Park west of Pulaski, Mr. Klupshas stated that an annual work demand survey, a "windshield-type" survey from an automobile, was conducted. The purpose of the annual work demand survey was to look for areas that need work. At the time of the incident, he conducted the annual work demand survey on approximately 800 to 1,000 miles of roads. It might take one or two months to complete and at the speed, 20 mph, at which he drove, he would not see every pothole. He did not have specific recall of the survey on Irving Park.

Mr. Klupshas stated that employees who use the road would report anything they noticed. If he passed over the road, he would always be looking out or trying to be aware of anything that would exist in the travel lanes. His yard is a mile and three quarters from Marmora. He did not know whether any employees used Irving Park to get to and from work during the years 1991 and 1992. He at times sent maintenance crews on Irving Park to patch potholes.

Prior to November 3, 1991, one of Mr. Klupshas' supervisors told him to have the workers patch holes even where the city of Chicago permitted parking. The State has a maintenance agreement with the city of Chicago for Irving Park east of Pulaski Road. The agreement included routine maintenance of which pothole patching would be one of the functions. Marmora is west of Pulaski. He had

never seen a maintenance agreement for Irving Park west of Pulaski. In his deposition, he agreed that there was no agreement between the State and the city of Chicago for pothole patching in the area of Irving Park and Marmora.

D. Testimony of Dr. Scott Seymour.

Dr. Scott Seymour, an orthopedic surgeon, testified that he treated Claimant. (Claimant's Exhibit No. 29A.) He saw Claimant on November 4, 1992, for a problem with his right ankle. Claimant had ecchymosis, swelling and tenderness over the lateral aspect of the ankle just anterior and inferior to the lateral ligaments. The x-rays of his foot showed a fracture of the anterior process of the calcaneus (heel bone). His foot was placed into a short leg cast that extended from his toes to below his knee.

Dr. Seymour saw Claimant on December 2, 1992. The cast was removed and Claimant's ankle and foot were examined. The examination revealed the "swelling and bruising had resolved and he was nontender at the fracture site." Claimant's foot showed some limitation in its range of motion and he had some slight pain when his foot was moved back and forth. Dr. Seymour instructed Claimant to begin some range of motion exercises for his ankle as well as using heat and ice. Claimant had been off of work pursuant to Dr. Seymour's advice.

Dr. Seymour saw Claimant on December 11. Claimant was noticing some pain in the outside of the foot, especially when it turned inwards. His ankle motion was better and he still had some minimal tenderness at the fracture site. He had mild pain with stress or twisting the foot inward. He told Claimant to expect pain for another few weeks to a month. He did not see Claimant for this injury after December 11. It was his opinion that Claimant's injury was caused by the accident. Dr. Seymour

billed Claimant $75 for x-rays, $360 for treatment for the fracture, $30 for the December 2 office visit and $30 for the December 11 visit.

On cross-examination, Dr. Seymour stated that Claimant did not complain to him about any low back pain. He treated Claimant on August 27 and September 2, 1994, apparently for a different condition; however, Claimant did not complain about any low back pain. It was Dr. Seymour's opinion that the future prognosis of Claimant's heel was excellent.

E.  Testimony of Spiros G. Stamelos, M.D.

Spiros G. Stamelos, M.D., a board certified orthopedic surgeon, testified to his impressive credentials. He first examined Claimant on May 5, 1993. Claimant complained about low back pain radiating down to his leg bilaterally. Dr. Stamelos' diagnosis was low back pain syndrome and he thought the discs were the problem. The MRI of the lumbar spine showed a right to central bulging disc of L5-S1. He recommended rest and light duty for the Claimant. He thought Claimant had a herniated disc at L4-L5.

Claimant was not any better when Dr. Stamelos saw him again on May 19 and June 16, 1993, and continued him on light duty. He performed surgery on Claimant on August 26, 1993. It was a minimally invasive procedure. He performed a discogram on the two suspicious levels and one above (L3-L4, L4-L5 and L5-S1). The L4-L5 was definitely pathological with torn annulus and dye that was protruding close to the canal. He performed laser surgery on L4-L5, putting a probe into that disc and giving it 1,800 joules, a medium amount of heat which would shrink it about 10%. It was performed on an outpatient basis with needles. Claimant was advised to stay off work until October 1, 1993.

Dr. Stamelos saw Claimant on September 1 and 29, 1993, and he prescribed anti-inflammatory medicine, therapy and home exercises. Claimant was still off work as of November 3, 1993. He was released for light duty on January 7, 1994. He was released for unrestricted duty on March 9, 1994. He did not see Claimant until December 23, 1996.

On December 23, 1996, he evaluated Claimant because he had aggravated his spine secondary to an altered gait problem. Claimant had not told him about the injury to his heel when he visited Dr. Stamelos in 1993. Dr. Stamelos had found the abnormal disc at L4-L5. Dr. Stamelos opined that Claimant had caused the disc by the fall, or "he had aggravated his disc by an abnormal gait like carrying a cast around."

On August 15, 1997, he examined Claimant. Claimant had reported lifting his baby when he felt an aggravation of his back and had tingling going to his lower back to the S1 (sacroiliac) joints. Dr. Stamelos gave Claimant an epidural injection and excused him from work for three or four weeks to let the crises pass. He never saw Claimant again.

Dr. Stamelos' opinion was that the L5-S1 was much too old. The L4-L5 was approximately about a year or less. He believed he had a tearing of the fibers of the annulus fibrosis, which is a gradual (or festering) process. He believed the disc at L4-L5 was caused by falling or walking around with a heavy cast which caused the problem or aggravated it. He opined that ordinary daily activities could have caused the herniated disc because the annules fibrosis had been weakened. "There's no doubt in [Dr. Stamelos'] mind that the symptoms that he had in '97 and other times and will have in the future are from

that disc." The condition Claimant has in his back at L4-L5 area is permanent. It is an irreversible condition.

On May 10, 1993, Dr. Stamelos excused Claimant from work. On May 26 he released him to return to light duty. His medical bills were $5,695 and the physical therapy fees were $675.

On cross-examination, Dr. Stamelos acknowledged that Claimant did not inform him of the November 3, 1992 accident. He acknowledged that it was possible that an intervening injury other than November 3, 1993, incident caused the pathology to L4-L5. Claimant did not show for an appointment on August 29, 1997.

F. Claimant's Exhibits

Claimant's Exhibits Nos. 1-8, the photographs, were admitted into evidence without objection. Claimant's Exhibits Nos. 9-27 were admitted into evidence without objection. Claimant's Exhibits Nos. 9-22 are in relation to medical services. Claimant's Exhibit No. 23 is a receipt for "work out" clothes, No. 24 is a receipt for the telephone cord, No. 25 is a Chicago Police Department wage loss verification for 64 days of lost time from November 3, 1992, to January 3, 1993, at an average monthly salary of $3,424.50, No. 26 is a February 7, 1997 Notice of Lien of the City of Chicago in the amount of $23,742.20 and Group No. 27 are three payroll stubs for the period of July 15 through August 31, 1997.

Respondent objected to the admission of Claimant's Exhibit No. 28, Respondent's answers to Claimant's interrogatories, which was admitted over Respondent's objection. Claimant's Exhibits Nos. 29A and 29B, the deposition of Dr. Scott Seymour, was admitted without objection. Claimant's Exhibit No. 30, the transcript of the evidence

deposition of Dr. Spiros J. Stamelos, was admitted into evidence without objection. Claimant's Exhibit No. 31 (Vital Statistics of the United States 1991 Life Tables), stating that a white male age 45 to 50 had 33.9 years of life expectancy as of 1991, was admitted without objection.

### III. Respondent's Case In Chief

A. Testimony of Frank Klupshas.

Mr. Klupshas testified that he is made aware of roadways that are in need of repair by complaints from local agencies, police department, fire department, Chicago Department of Streets and Sanitation, citizens, State employees, Department of Transportation employees and other agencies. He records the complaint information on a complaint form. There is a place on the form for a description of the action taken by the lead worker or individuals who took care of the complaint. The form goes into a file he keeps for every road that is under his jurisdiction. He has maintained those files for almost 19 years and has never purged them. When he learned of the claim brought by Claimant, there were two reviews of the files. He first had a clerk go through the files. He reviewed the files after his deposition. He did not find a complaint concerning a pothole at Irving Park and Marmora.

His focus is the travel lanes to make sure the vehicle or traffic is going to move safely and smoothly. He has been instructed that the movement of traffic is their primary concern. He does not consider pedestrians. He has been to or passed by the intersection in question numerous times prior to November, 1992. He has passed by that intersection hundreds of times for the express purpose of inspecting the roadways. He never noticed the pothole depicted in Claimant's Exhibit No. 1 in all the times that

he visited or passed by the intersection prior to November, 1992. He would not be looking at the location where the pothole is depicted because it is not in a travel lane. He only looked at travel lanes. The pothole is in the parking lane. He was instructed by his first supervisor that the State did not permit parking on a State right-of-way and, if the local municipality permits parking on a State right-of-way, the State will not assume maintenance of that lane. Irving Park Road is a State highway, Illinois Route 19. The city of Chicago permits parking on Irving Road. They have parking meters to the west of the intersection adjacent to the bank.

The witness described the size of the hole as an inch to an inch and one-half deep, based upon the relationship of the asphalt to the gutter of the curb. In the event he saw this hole, he would not have instructed a crew to repair it because it is a parking lane and responsibility for it would be with the city of Chicago.

Mr. Klupshas has never seen a written agreement that indicates the City will maintain the parking lanes on State highways if the City permits parking. He has been operating under the premise that the City will maintain parking lanes on Irving Park for 19 years. He was "instructed with that premise" by all five of his supervisors over the last 18½ years. He knew the State resurfaced the travel lanes east of the intersection and omitted the parking lanes because the city of Chicago would not fund the project. The city of Chicago does the street sweeping on Irving Park. The city of Chicago stripes Irving Park. The City conducts snowplowing because it is a CTA Route.

On cross-examination, he stated that the "instruction" changed over time, especially after December, 1991. He acknowledged the road where the hole depicted in Claimant's Exhibits Nos. 1-7 was an area where vehicles drove, *i.e.*, buses.

B. Testimony of Carol Cunningham.

Ms. Carol Cunningham, litigation supervisor for the Department of Transportation, testified that she is familiar with the procedure by which complaints of roadway defects are received by the Department. A communication center, over 24 hours a day, receives complaints. The complaints are communicated to the yard. The information about a complaint is handwritten or typed. The complaint forms are filed at the claims bureau. Routine maintenance would include potholes. She reviewed those files with relationship to the instant claim for August through November, 1992. There were not any complaints in the file about a pothole located at Irving Park and Marmora.

On cross-examination, Ms. Cunningham acknowledges that she reviewed the files at the District 1 of complaints that come directly into that office. She did not review the records at the maintenance yard.

C. Testimony of Harold Stojentin.

Claimant stated that he had back problems after an incident with plywood in 1985 or 1986. Some of the incidents when he injured his back were work related due to his work as a police officer, including rescuing a child from the harm of a pit bull in April, 1994. He recalled having a fracture of his fifth metatarsal in August of 1984 and wearing a cast. He was in two automobile accidents prior to 1992.

D. Respondent's Exhibits.

The evidence deposition of Dr. Theodore Balsam (Respondent's Exhibit No. 1) was admitted into evidence over the objection of Claimant. Claimant cited *Petrillo*.

IV. Claimant's Argument.

A. Liability.

The State does not contest that Irving Park Road, in the area where Claimant's accident occurred, is a State

highway. In *Kraemer v. State* (1990), 42 Ill. Ct. Cl. 236, 245, the Court stated that "it is the duty of the State to exercise reasonable care in the maintenance and care of its highways in order that defective and dangerous conditions likely to injure persons lawfully on the highways shall not exist." The exercise of reasonable care requires the State to keep its highways reasonably safe.

Claimant relies on *Baren v. State* (1974), 30 Ill. Ct. Cl. 162, asserting that it appears to be a dispositive of the issues on Respondent's duty. In *Baren*, Claimant was a pedestrian who fractured her left foot as she stepped into a depression in a street maintained by Respondent. She never saw the hole into which she stepped until after she fell. Photographs of the hole indicated it was about three-feet long, two-feet wide and three to four-inches deep. A witness testified that the hole had existed for over one month to three to four months prior to the incident. Based on testimony that the hole was present for over one month, and possibly for as long as three to four months, the Court concluded that the hole had existed for a sufficient period to have put Respondent on notice of its existence and to enable it to either make repairs or to erect a warning to pedestrian and vehicle traffic. (30 Ill. Ct. Cl. at 166.) The State argued that it did not owe a duty to maintain the road where the accident occurred for pedestrian traffic because Claimant was not walking in a designated pedestrian crosswalk. However, the Court reasoned that Respondent owed a duty to maintain its roads in a reasonably safe condition, for the purposes to which the portion in question is devoted. Claimant's use of the portion of the pavement was entirely reasonable. The Court further found that she was not contributorily negligent although she had not seen the hole prior to her fall. (30 Ill. Ct. Cl. at 166.) The Respondent was found to have had constructive notice of the existence of the hole

in the pavement and to have been negligent in failing to repair the defect.

In the instant case, Paul Peterlin testified that the hole, located in the crosswalk on the northwest corner, was 8 to 10 inches wide, 18 or 20 inches long, and 4 to 5 inches deep, and had existed for a year or two prior to December 31, 1992. That period of time exceeds the period found sufficient to have put Respondent on notice in the *Baren* case.

In the instant case, Claimant was in a designated, marked, pedestrian crosswalk area at the time of his fall. The hole was within the marked, designated, pedestrian crosswalk area. Respondent intended that the crosswalk area be used by pedestrians for the purpose of crossing its highway, Irving Park Road. Therefore, Respondent owed a duty to maintain that crosswalk area in a reasonably safe condition.

*Gillespie v. State* (1996), 25 Ill. Ct. Cl. 309, appears dispositive of the issues herein. Claimant, a pedestrian, crossed the State highway in the crosswalk when she stepped over a curb into an asphalt parkway. There was a hole or the asphalt was cracked. Testimony was to the effect that that condition had existed for at least four months prior to the date of the accident. (25 Ill. Ct. Cl. at 311.) The Court held that the State had knowledge of the condition as it had existed for more than four months prior to the accident, which was certainly sufficient time within which to make repairs or to barricade the same from use by pedestrian traffic. Gillespie was watchful of traffic and she was found not to have been contributorily negligent.

Claimant also cites *Webee v. State* (1985), 38 Ill. Ct. Cl. 164, and *Stills v. State* (1989), 41 Ill. Ct. Cl. 60. In the

*Stills* case, the Court stated that the existence of potholes for a period of four to twelve weeks prior to the accident was a sufficient length of time for the State to be charged with constructive notice of the defect. 40 Ill. Ct. Cl. at 62.

In this case, Respondent owed the public, including Claimant herein, a duty to use reasonable care with regard to the maintenance of the crosswalk area at the site of his fall. The defect in the crosswalk was present for at least one year; and this Court has held that much less time than that was sufficient to have given Respondent constructive notice of its existence and for it to have effectuated repairs or place warnings. Respondent failed to discharge its duty properly. Its negligence also is manifested in the testimony of Frank Klupshas, who testified that he was not concerned with potholes in the crosswalk.

Respondent's contention that an agreement existed with the city of Chicago to maintain the area where Claimant's accident occurred is without any basis, as Frank Klupshas testified there was no such agreement for that area and the only area for which such an agreement existed was east of Pulaski, a distance of almost three miles from Irving Park and Marmora. He also admitted having received conflicting instructions regarding pothole patching in streets where parking was permitted and admitted that a supervisor had instructed him to patch potholes in lanes where parking was permitted subsequent to December, 1991, and prior to Claimant's accident.

There was also testimony that buses and vehicles traveled in the lane and crosswalk area where Claimant fell, and that lane was used by U.S. Post Office vehicles.

Klupshas' testimony as to the depth of the hole in Claimant's exhibits is not persuasive because the hole was filled. He testified he could not tell the depth of the hole.

He admitted that he was estimating the depth and that he did not know the depth of the hole.

In its verified answers to Claimant's interrogatories, Respondent, in response to Nos. 15 and 16, averred that various employees of Northside Maintenance Yard had job duties and responsibilities with regard to maintenance, repair and determining the condition of Irving Park Road at or near Marmora Avenue, Chicago, Illinois, including the area of the west crosswalk thereof, for the period of November 3, 1982, to the present date.

Respondent has presented no evidence of any agreement or contract with any entity for the maintenance and repair of Irving Park Road at the location of Claimant's fall. Respondent has not introduced any evidence with regard to the discharge of its duty to take reasonable care with regard to maintenance of its highways in the area where Claimant's accident occurred. Frank Klupshas testified that he was not concerned with pedestrians and he would not even have considered the area where Claimant fell in his annual drive by work demand surveys.

B. Damages.

Claimant asserts that as a result of his fall, Claimant sustained injuries to his right foot and to his back at the L4-L5 area. Immediately following the accident, he went to Our Lady of the Resurrection Medical Center for treatment. He was subsequently treated by Dr. Scott Seymour, who diagnosed a fracture of the anterior process of the calcaneus (heel bone). He was placed into a short leg cast and allowed to ambulate. He remained under the care of Dr. Seymour until December 11, 1992.

Following his accident on November 3, 1992, he experienced pain in his back. This pain, while in some respects similar to the pain he had prior to his fall, also was

different. He first sought chiropractic attention on November 6, 1992, and, when that did not afford him any lasting relief sought additional medical attention. In May, 1993, he came under the care and treatment of Dr. Spiros G. Stamelos.

Dr. Stamelos testified that he found two conditions in Claimant's back. The condition at the L5-S1 area was of long standing. However, the pathological condition which he found at the L4-L5 area was recent. He testified that Claimant's fall tore the fibers of the annulus dibrosus. This tearing started a gradual process during which the disc first bulges and then herniates. The disc condition at L4-L5 was caused by his fall on November 3, 1992, or by his wearing of the cast due to the heel fracture. Once such a process exists and the disc has been weakened, the disc can be herniated with a sneeze, bending over or coughing. That factor was the precipitating factor, but the cause of the injury to the disc was the fall. The force which caused a calcaneus fracture was significant enough to have caused injury to his back at the L4-L5 disc level. After a period of conservative treatment, he performed surgery on August 26, 1993. During that surgery, he found that pathology existed at the L4-L5 level and laser burned the disc there to debulk it and to relieve the pressure on the nerves and spinal cord.

The area of the back for which Claimant had sought chiropractic attention prior to November 3, 1992, was as a result of the pathology at the L5-S1 level. That was the area at which he had been experiencing pain since 1985 or 1986. The prior chiropractic treatments he had received were at the waist line level because of this prior injury. Dr. Stamelos testified that his discogram examination revealed pathology at L4-L5, which pathology was recent and was caused by his fall in November, 1992. He

testified further that that condition is permanent as the disc at that level has been permanently injured. At the L4-L5 level, he found no pathology to indicate that the disc pathology had been around for a long time. His treatment on August 15, 1997, was due to the permanent injury to the disc at the L4-L5 level. When he lifted his baby, it aggravated his pre-existing L4-L5 problem. Claimant will experience symptomology in the future because of pathology at the L4-L5 disc level. His condition at L4-L5 is irreversible and he will suffer the complications of the loss of a functioning disc, which means that he will have discogenic pain, degeneration of the disc, facet arthritis, narrowing of that level and a precursor to instability and microinstability and to degenerative disc and degenerative spine disease. He might need future surgery at the L4-L5 area and there is a 25% chance that he might need a spinal fusion.

Claimant lost time from his employment with the city of Chicago Police Department and with Taft High School. Dr. Seymour and Dr. Stamelos testified that the period of time lost from work by Claimant was based on their recommendations and advice. He was off work for the following periods of time at the following monthly salary:

11/3/92 - 1/3/93 . . . . . . . . . $3,424.50
11/3/92 - 1/3/93 . . . . . . . . . $10/hour (Taft High School)
4/6/93 - 4/14/93 . . . . . . . . . . . $3,796
5/8/93 - 5/26/93 . . . . . . . . . . . $3,796
8/24/93 - 12/31/93 . . . . . . . . . $3,796
1/1/94 - 1/31/94 . . . . . . . . . . . $3,948
August, 1997 (two weeks) . . . . . $4,358

Claimant's medical expenses, as set forth in amended paragraph 16, is in the amount of $14,863. His wage loss is in the amount of $32,334.32, excluding wage loss from

Taft High School. In addition, he incurred $65.33 in purchase of clothing and telephone extension cord. His total items of damage is in the amount of $47,262.65

He has pain, throbbing and stiffness in the right heel area with weather changes, humidity, dampness, coldness and barometric pressure. He has pain in his back at least once per month and with weather changes. He has stiffness in his back on a daily basis. He does stretching exercises upon arising in the morning and prior to retiring at night. When he has pain, whether it is in his heel or in his back, he tries to get off his feet and rest.

Admitted into evidence as Claimant's Exhibit No. 21 were the mortality tables, Vital Statistics of the United States 1991 Life Tables, which fixed his life expectancy as of 1991 at 33.9 years. Inasmuch as the damage to his back at the L4-L5 level is permanent, he will continue to suffer pain and stiffness, further degeneration of that area, and he is a candidate for arthritis, instability and surgery for his life expectancy.

Claimant prays that an award for damages be entered against the State of Illinois in the sum of $100,000.

## V. Respondent's Argument

### A. Liability.

In *Kraemer v. State* (1990), 42 Ill. Ct. Cl. 236, 245, the Court outlined that a "claimant must prove by a preponderance of the evidence that the State breached its duty of reasonable care and the negligence flowing from the breach proximately caused the accident and claimant's injuries." This Court has held it is the duty of the State to exercise reasonable care in the maintenance and care of its highways in order that defective and dangerous conditions likely to injure persons lawfully on the highway

shall not exist. *Weber v. State* (1985), 38 Ill. Ct. Cl. 164, 167.

Respondent cites *Storen v. City of Chicago*, 373 Ill. 530, and *Boender v. City of Harvey*, 251 Ill. 228, for the proposition that a municipality is liable if a person exercising ordinary prudence cannot avoid danger or injury in passing in general and such defects as cannot be readily detected. In *Joyner v. State* (1955), 22 Ill. Ct. Cl. 213, 217, the Court stated that notice of the existence of a defect in a municipal street may be implied, if the condition existed for such a length of time that the corporate authorities should have ascertained its existence and effected a remedy. Strong and convincing proof is required to establish this element.

Claimant relies on the case of *Kraemer v. State* (1990), 42 Ill. Ct. Cl. 236, to establish constructive notice. In that case, a pedestrian fell into a hole that was described as three-feet long, two-feet wide and three- to four-inches deep. A witness testifies the hole had existed from one to four months prior to the fall. In the instant case, Paul Peterlin testified the hole was 8- to 10-inches wide, 18- or 20-inches long and 4- to 5-inches deep, and had existed from between one year to two years prior to December 31, 1992. Mr. Peterlin also testified that his father-in-law had fallen in the same hole six months earlier and was mad as hell about it. The testimony of Mr. Peterlin, an admitted friend of the Claimant, should not be given much weight. His description of the hole varies from the Claimant's description of the hole. Mr. Stojentin described the hole as two-feet wide, one-foot across and roughly two-inches deep. Frank Klupshas testified that the hole in question was not more than an inch to an inch and one-half deep. Mr. Peterlin's testimony falls short of the standard held by the *Joyner* court that proof of constructive notice requires strong and convincing proof.

This Court has repeatedly held that the State is not an insurer against accidents. The State's duty is to use ordinary care in the maintenance of its highways. The testimony of Frank Klupshas and Carol Cunningham, as to the procedures the State of Illinois employs to maintain its highways, is proof the State uses reasonable care. Mr. Klupshas testified that IDOT routinely patrols its highways looking for defects. Even though Mr. Klupshas admitted he was not concerned with potholes in the crosswalk areas, this by itself is not proof that the State breached its duty to use reasonable care in the maintenance of its highways. Mr. Klupshas testified that he does not notice every pothole on road surveys, it is impossible. He conducts surveys on thousands of miles of State roadways. For him to miss a pothole on his road survey would not be considered a breach of the standard of reasonable care. Carol Cunningham testified that the State has procedures for citizen complaints for road defects. The Department keeps a 24-hour hotline for complaints regarding road defects and logs them on an intake form, with information of who calls, when the call was made, the nature of the defect, the area affected by the defect and who took the call.

The Court has also adopted the doctrine of comparative negligence. (*Kraemer v. State* (1990), 42 Ill. Ct. Cl. 236, 246.) Respondent cites in *Beenes v. State* (1951), 211 Ill. Ct. Cl. 83, 86, to support the proposition that pedestrians cannot blindly walk and not watch where they are going. In the instant case, Mr. Stojentin testified that he had never been on foot at the intersection of Irving Park and Marmora Avenue prior to his accident. This is all the more reason for him to be looking where he was walking. If the hole was such an obvious defect, then he should have noticed it. If it was not such an obvious and readily apparent defect, the State has no liability for hidden defects.

Ms. Cunningham's testimony, that no records of an intake call was made to IDOT after she searched the records, proves that the State did not have actual notice. The State may be held liable if it had notice of the defect. Constructive notice will be established if it can be proven by strong and convincing proof that the defect existed for such a length of time as to confer notice on the State.

B. Damages.

As a result of his fall, Claimant broke his heel and claims injury to his lower back. After his fall, the Claimant drove himself to Our Lady of the Resurrection Hospital for treatment. He was referred to Dr. Scott Seymour who diagnosed his right heel as broken, placed a cast on it and gave him crutches to ambulate. At no time did Claimant inform Dr. Seymour that his lower back was injured or in pain as a result of his fall on November 3, 1992.

The Claimant then went to Dr. Saddy, a chiropractor who administered 13 spinal adjustments from December, 1992, through February, 1993. Having received no relief, he then saw Dr. Ridley. Having received no relief, he then saw Dr. Keagy. Having received no relief, he then saw Dr. Sirajullah. Having received no relief, he next saw Dr. Stamelos.

Dr. Stamelos testified that the Claimant did not even relay the information of his fall on November 3, 1992, until August of 1997, more than four years after the first time he saw Dr. Stamelos in May of 1993. If the fall had caused injury to his lower back, a reasonable person would assume that is the reason why he is seeing a doctor about his back, but this is not what occurred. He was treated by Dr. Stamelos for a period over four years and never related this information to him for a more accurate diagnosis of his

back. Dr. Stamelos also testified that he is of the opinion that the fall or his wearing of the cast on his right foot which caused an altered gait, was the cause of his back injury. He believes this even though he does not know how the Claimant fell, whether he fell forward, sideways, backwards or straight down. None of these factors were taken into consideration by Dr. Stamelos when he rendered his opinion. Dr. Stamelos also testified that the Claimant's chiropractic adjustments may have contributed to the lower back injury. He also was of the opinion that an old injury to the L5-S1 disc could contribute to the injury at L4-L5 if the old injury had occurred within four years prior to the injury of the L4-L5 disc. He is also of the opinion that the fall may have weakened the L4-L5 disc, but not herniated it. Dr. Stamelos performed outpatient laser surgery to the Claimant's lower back on August 26, 1993. As a result of the outpatient surgery, Claimant was off work for six months.

This Claimant has had a history of problems with his lower back since he was injured in Vietnam. He admitted that he had injured his back at least eight times prior to the November 3, 1992 fall—some work related, some not. This Claimant has not proved by a preponderance of the evidence that his lower back injury is related to his fall on November 3, 1992.

The Claimant's attempt to bootstrap the back injury to the fall on November 3, 1992, simply does not hold water. There is no proof that he injured his back in the fall. The Claimant has a history of back problems and to hold the State liable for this injury, as well as future back injuries, is simply not supported by the facts of this case. The Claimant's lower back condition was a pre-existing injury. Testimony showed that the Claimant injured his back while on duty as a Chicago Police Officer. This

could have contributed to his lower back problem as much as the fall on November 3, 1992. Dr. Seymour testified that the Claimant will recover fully from his heel injury with no residual effects, including weather related changes. The State also does not believe that it is liable for the cost of clothing for Claimant nor a telephone extension cord.

## VI. Claimant's Reply

Claimant notes that Respondent concedes that it owed Claimant a duty to exercise reasonable care. Claimant cites *Anderson v. State* (1955), 22 Ill. Ct. Cl. 413, where a hole two-inches deep, one- to two-feet long and one-foot wide, in existence for one month was sufficient to give the State constructive notice. *St. Cyr v. State* (1989), 41 Ill. Ct. Cl. 36, is cited by Claimant as a case where length of time of existence of a defect was less than one day.

## VII. Opinion

The Respondent does not dispute that Claimant injured his foot by stepping off the curb and into a pothole, that existed in the pedestrian crosswalk on November 3, 1992, in an attempt to cross Irving Park Road in Chicago. Irving Park is a State of Illinois public right-of-way.

For liability to be imposed upon the State, Claimant must prove by a preponderance of the evidence that the State breached its duty of reasonable care and the negligence flowing from the breach proximately caused the accident and Claimant's injuries. *Kraemer v. State* (1990), 42 Ill. Ct. Cl. 236.

The State owes a duty to all users of the highways to maintain the rights-of-way in a reasonably safe condition. (*Eudaley v. State* (1995), 47 Ill. Ct. Cl. 86.) The State has

no duty to be an insurer of its highways, but does have a duty to keep the highways reasonably safe for the purposes for which they were intended. (*Alsobrook v. State* (1995), 48 Ill. Ct. Cl. 205.) Claimant must prove either actual or constructive notice of the defect by the State in order to recover.

Claimant did not present any evidence of actual notice and the Respondent's witnesses did not discover any record of complaint or actual notice of the pothole. Therefore, liability must be decided based on whether constructive notice can be determined on the facts in this record. Proving constructive notice is a difficult burden for a claimant to meet. The two general methods for proving constructive notice of a defect are the length of time the defect has existed and/or the defect being so obvious that constructive notice should be imputed by the nature of the defect itself. *Alsobrook* at 207.

The Court has consistently held that each case involving constructive notice must be decided on its own particular facts. (*Eudaley* at 90 citing *Buglar v. State* (1967), 26 Ill. Ct. Cl. 173.) The *Eudaley* court reasoned that the State may be charged with constructive notice where, through the exercise of due diligence, a condition should have been discovered. The Court in *Toliver v. State* (1994), 47 Ill. Ct. Cl. 55, stated that constructive notice would exist if a dangerous condition existed for such a length of time, that public authorities, by exercise of reasonable care and diligence, should have known of the condition and had opportunity to make the roadway safe. To prove constructive notice, Claimant must show that the "defect was substantial enough and * * * existed for such a length of time that reasonable persons would conclude that immediate repairs should be made * * *." (*Hanawell v. State* (1995), 47 Ill. Ct. Cl. 270, 275, quoting

from *Aetna Casualty v. State* (1984), 37 Ill. Ct. Cl. 179, 181.) The test for constructive notice is "whether the condition by its evident nature, duration and potential harm should necessarily have come to the attention of the State." *Commercial Union Insurance Co. v. State* (1995), 47 Ill. Ct. Cl. 301.

The State can delegate its duty to maintain by written agreement with any other highway authority and relieve itself of liability. *Burke v. State* (1994), 47 Ill. Ct. Cl. 112. In the case at bar, there is not any evidence of a written agreement between the State and the city of Chicago; therefore, liability remains with the State.

The Respondent asserts that there are discrepancies between Claimant's description of the hole and Mr. Peterlin's description. Claimant described the hole wider than Peterlin's description, but Peterlin described the length to be longer than Claimant's description. However, the aggregate descriptions were similar. Respondent also asserts that Peterlin's testimony should be discounted because he is acquainted with Claimant. Mr. Peterlin appeared to be a credible witness and there was no showing that his relationship extended beyond a simple acquaintance. He expressed knowledge of the hole to Claimant in what appeared to be an unrelated conversation.

The pothole in the case at bar appears to be a little smaller than the potholes in cases cited by Claimant, except that in *Gillespie v. State* the Court found liability when that claimant tripped on cracked pavement. Respondent does not cite any pothole cases from this Court.

The facts integral to a decision on liability in this case are: (i) there is evidence of the pothole existing for at least one year; (ii) the pothole might be considered to be somewhat small, but it is in the middle of a crosswalk on a

busy street; (iii) the pothole is visible but is at the base of the curb; (iv) there is no evidence that Respondent undertook to look for defects in the location of the pothole and it appears that, according to Mr. Klupshas, had Respondent noticed the pothole it would not have repaired it; and (v) there is no written agreement requiring the city of Chicago to make repairs at this location. Based upon the above facts, the Court finds that Claimant satisfied his burden to prove by a preponderance of the evidence that Respondent breached its duty to him. The Respondent failed to rebut the *prima facie* case established by Claimant. Although the hole is visible, Claimant testified that his attention was focused primarily on vehicular traffic during rush hour. Located at the base of the curb it is reasonable to conclude that, as he approached the curb, his view of the hole was obscured by the curb and, in his attempt to cross a busy street, he might not notice the defect.

Claimant demonstrated constructive notice by the testimony of Mr. Peterlin and the location and size of the pothole. Although the pothole might not have been a dangerous defect for motor vehicles, it was in a pedestrian crosswalk on a busy street. This is in an area intended for pedestrian traffic and the State breached its duty by not using reasonable care or diligence in inspecting and ensuring that the crosswalk was safe and free of defects for pedestrians.

Claimant has proved that the Respondent's negligence was the proximate cause of the injury to his foot and heel. The question of whether the negligence was the proximate cause of Claimant's back problems, especially to the area of L4-L5, experienced subsequent to the incident is more difficult. Claimant provided medical opinion that the fall or the wearing of the cast caused the L4-L5

problem. Respondent did not rebut this medical opinion. The Court could rely on this evidence and find that the fall or the wearing of the cast caused the L4-L5 problem. However, Claimant's somewhat extensive prior back problems, Dr. Stamelos' acknowledgment that the L4-L5 problem could have been caused by other incidents, and the very nature of the L4-L5 condition led to a more reasonable conclusion that Claimant did not meet his burden of proving that the negligence was the proximate cause of L4-L5 problem. The L4-L5 problem did not manifest itself until some time after the incident and the "festering process" of the fibers of the annulus fibrosis could have just as plausibly been initiated or culminated by any other physical conduct or experiences of Claimant.

The Claimant will be awarded an amount to compensate him for the injuries to his foot and loss of earnings suffered because of Respondent's negligence. Respondent has raised the issue of comparative negligence, asserting that Claimant had a duty to watch where he was walking and should have been more careful to avoid what appears to be a plainly visible hole. Respondent's argument has merit and Claimant's award is reduced by 25% to reflect his own negligence.

The Claimant's injury to his foot and heel will be compensated in the amount of $5,000. Claimant was off work at the Chicago Police Department for two months, November 3, 1992, through January 3, 1993, and was earning $3,424.50 per month. There is no evidence that Claimant received his pay, or any other disability; therefore, he should be awarded $6,849 for loss of earnings. Claimant should be awarded $64.33 for the clothing and extension cord. Claimant also testified that he was unable to work his second job, as security guard at Taft High School, and that he ultimately lost that job because of his unavailability. Although

he testified that he was earning $10 per hour, there is no evidence, other than his testimony of approximately 20 hours during school weeks, to demonstrate the length of time he had the security job, his actual or average hours of work, the amount of time he would have missed because of his injury, or the cause of the resulting loss and inability to reacquire the position subsequent to his injury (or recovery). It would be too speculative for the Court to make an award for this loss of earnings.

Therefore, the Court finds Claimant's damages to be $11,913.33 and reduced these damages by 25%. The Court enters an award of $8,935. Payment of the award is to be withheld pending resolution of the issue of the lien. (See Claimant's Exhibit No. 26.)